**STEPHEN S. WALTERS**
OSB No. 801200
swalters@allenmatkins.com
**DAVID OSIAS**
CA Bar No. 091227
dosias@allenmatkins.com
**DAVID ZARO**
CA Bar No. 124334
dzaro@allenmatkins.com
**ALLEN MATKINS LLP**
12th Floor
Three Embarcadero Center
San Francisco, California 94111
Telephone: 415-837-1515
Facsimile: 415-837-1516

**WILLIAM L. LARKINS, JR.**
OSB No. 812882
wlarkins@larkinsvacura.com
**JULIE R. VACURA**
OSB No. 843692
jvacura@larkinsvacura.com
**LARKINS VACURA LLP**
621 S.W. Morrison St., Suite 1450
Portland, Oregon 97205-3817
Telephone: 503-222-4424
Facsimile: 503-827-7600
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| MICHAEL GRASSMUECK, Receiver, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| K&L Gates LLP, a Delaware limited liability partnership | (Professional Negligence; Negligent Misrepresentation; Aiding and Abetting Breach of Fiduciary Duty; Disgorgement) |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff Michael Grassmueck ("Receiver") alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for professional negligence, negligent misrepresentation, and aiding and abetting breaches of fiduciary duty.  Plaintiff Michael A. Grassmueck is the Court-appointed equity Receiver for Sunwest Management, Inc. and a number of its affiliates (as further defined in the orders appointing the Receiver, the "Receivership Entities").  Defendant K&L Gates LLP is a law firm with offices in, among other places, Portland, Oregon.  Plaintiff alleges that defendant breached applicable standards of care in performing legal services for the Receivership Entities, and aided and abetted breaches of fiduciary duty by the principals of the entities.  Plaintiff seeks damages of more than $100 million and disgorgement of legal fees paid to Defendant.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1367, in that this case arises out of and is related to the matters at issue in *SEC v. Sunwest Management, Inc., et al.*, Case No. 09-CV-6056-HO ("*SEC v. Sunwest*"), which is now pending in this Court.

3.      Venue is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events and omissions that give rise to the action occurred, and a substantial part of the property that is the subject of the action is located, in this District.

## PARTIES

4.      Pursuant to the Orders entered by this Court March 10, 2009, and May 27, 2009, in the action entitled *SEC v. Sunwest Mgmt., Inc.*, Case No. 09-CV-6056-HO, plaintiff Michael Grassmueck is the duly appointed and acting receiver for the Receivership Entities.  The Receivership Entities include Sunwest Management, Inc. ("Sunwest"), Canyon Creek

Development, Inc. ("CCD"), Canyon Creek Financial, LLC ("CCF"), Fuse Advertising, Inc.,

KDA Construction, Inc. ("KDA") (collectively, "the Receivership Companies"), and numerous

other entities affiliated with various senior living facilities and real estate developments, most of

which are limited liability companies (collectively, "the Receivership Facilities").  Among other

things, the Orders authorize the Receiver to pursue all claims of the Receivership Entities against

third parties for the benefit of investors and creditors of the Receivership Entities.  The claims

asserted in this action fall within that provision of the Orders and this Court thus has ancillary

and supplemental jurisdiction over them.

     5.     Nearly all of the Receivership Entities are or were Oregon organizations having

their principal place of business in Salem, Oregon.  At all material times, Sunwest was primarily

engaged in the business of managing senior living facilities.  CCD was primarily engaged in the

business of developing and purchasing new facilities for Sunwest to manage.  CCF was primarily

engaged in the business of overseeing the various broker-dealers who funneled investors to

provide equity for facilities.  Fuse Advertising, Inc., is an assumed business name of Fuse

Advertising Agency, Inc., previously known as Fuse Ad Agency, Inc. (collectively, "Fuse");

Fuse was primarily engaged in the business of advertising the facilities.  KDA was primarily

engaged in the business of doing construction work on new facilities as well as repair and

improvement work on existing facilities.  The Receivership Facilities are primarily engaged in

the business of owning and operating the facilities.  The principals of the Receivership Entities

("Principals") each owned all or part of all of them either directly or indirectly and exercised

control over all of them.  The Principals include Jon M. Harder ("Harder"), Darryl Fisher

("Fisher"), Curtis Brody, Wallace Gutzler, Mike Deines, Daniel Fish, Sebastian Brown, Mark

Wentzein, Tom Biesiadecki, David Thurber, Tom Eyserbeck, Jeff Schumacher, Johnny Dinh,

Shaine Pearse, James Estes, Tom Wettlaufer, Tim Harmon, and others.  Additionally, various

friends, affiliates, and business partners of the Receivership Entities and Principals (collectively, the "Affiliates") contributed to the business plan of the Receivership Entities. The Receivership Entities, Principals, and Affiliates shall hereinafter be referred to collectively as the "Sunwest Entities" and their business operations as the "Sunwest Enterprise."

6.     Defendant K&L Gates LLP is a Delaware limited liability partnership with its principal place of business in Pittsburgh, Pennsylvania. K&L Gates LLP maintains an office in Oregon and is or has been registered here. K&L Gates LLP was previously registered as Kirkpatrick & Lockhart Preston Gates Ellis LLP. K&L Gates LLP has also operated in Oregon under the assumed business names K&L Preston Gates Ellis and K&L Gates. On information and belief, K&L Gates LLP is the successor to Preston Gates & Ellis LLP, an Oregon limited liability partnership, by means of a merger. The actions and omissions of K& L Gates and its employees and attorneys (collectively, "K&L Gates") described below occurred or were directed towards the Sunwest Entities in Oregon.

## COMMON FACTUAL ALLEGATIONS

### The Sunwest Enterprise

7.     Sunwest, the first of the Receivership Entities, was founded in 1992. By 2001, the Receivership Entities owned and operated approximately 20 senior living facilities. Rapid growth increased that number to over 270 facilities by 2008.

8.     The Sunwest Entities' business plan was to grow through the development and purchase of new facilities which would be owned by the Principals and in most cases managed by Sunwest. In simplified terms, the business plan operated in the following manner: To finance the development and purchase of new facilities, a Sunwest-affiliated entity would raise private funds from investors and, in many cases, obtain loans from banks and other lending institutions ("Lenders"). After developing or purchasing a facility, Sunwest's goal was to increase the

facility's occupancy rate to around 95%, which would increase revenues and the value of the

facility.  The borrowing entity would then refinance its loan and use the proceeds of the

refinancing to buy out the private investors.  With the investors paid off and higher revenues

from residents, the Receivership Facilities would have a positive net operating income, which

would add to the Sunwest Enterprise's overall bottom line.

      9.     The execution of the business plan was more complicated.  Beginning in 2006, for

nearly every facility that Sunwest developed or purchased, it created two entities:  one to own the

facility (the "Property Company") and one to operate it (the "Operating Company").  Each

Operating Company (a) leased its facility from the Property Company (and as described below,

the TIC investors) that owned the facility, and then (b) for senior housing facilities,

subcontracted the work of actually managing the facility to Sunwest.  CCD took over the role of

developing and purchasing new facilities in 2001.  Starting in 2006, CCF took over the role of

overseeing the various broker-dealers who funneled investors to the facilities and distributing

investor-relations materials to potential investors.

      10.    This is how loans were generally obtained from Lenders to finance the

development or purchase of new facilities:  The Property Company that was to own the facility

would obtain the loan, and it would be guaranteed by Harder and Fisher.  In some cases, the loan

would be cross-collateralized over multiple facilities, so that a default on the part of any facility

would constitute default on the part of all of the facilities subject to a loan from the same

lender.  For any given facility, the combined amount of the loan and the funds raised from

investors would exceed the amount needed to develop or purchase the facility.  The excess

amount of the loan was to be held in reserve by the Receivership Facilities that owned and

operated the facility.  The Receivership Companies told investors that the reserves would be used

as a cushion to ensure payment of the Receivership Facilities' debts during the first several months after the development or purchase, including to pay the investors' "rent."

11.    The Sunwest Entities' business plan also included an inter-entity loan component which was critical to the success of the Sunwest Enterprise but was not generally known or disclosed to investors. Most facilities had cash flow issues and a negative net worth due to various problems including: (a) an occupancy rate below 95%; (b) a longer delay than anticipated in reaching stabilization; (c) greater costs than anticipated; (d) lower revenues than anticipated; and (e) an inability to refinance the original loan on favorable terms. Receivership Facilities afflicted with those problems often had difficulty paying their obligations, including the "rent" to investors. In order to pay those debts, the Receivership Companies used a system of inter-entity loans whereby a cash-poor Receivership Facility's debts were paid with funds loaned from other Sunwest Entities, including from other Receivership Facilities' positive cash flow or reserves. Cash-poor Receivership Facilities were not the only beneficiaries of the inter-entity loans; almost every Sunwest Entity also frequently obtained loans from other Sunwest Entities, whether to pay pending bills or to serve as advances in financing new business operations or personal expenses. Most inter-entity loans were reflected only in journal or ledger entries and were never properly documented with promissory notes or similar instruments. This inter-entity lending took place on a daily basis based on the immediate cash needs of particular facilities and the immediate cash status of others; that is, the question asked was simply, "who has cash that we can move?" For most investment offerings, this practice was not disclosed to investors and violated the terms of the operating agreements of the Receivership Facilities and the loan documents between the Receivership Entities and the Lenders.

12.    The inter-entity loans, as well as funds used to repay those loans, were generally funneled through a bank account known as "the clearing account" before distribution to the

entities receiving the loans. The clearing account also contained other funds being disbursed from one Sunwest Entity to another, including: (a) loans made from one Receivership Company or Affiliate to another; (b) Harder's salary from the various Receivership Entities that employed him; and (c) disbursements to Harder from Sunwest Entities in which he had an ownership interest. The funneling of Receivership Facility loans through the clearing account constituted a commingling of Receivership Facility funds and loans, non-Receivership Facility funds and loans, and Harder's personal funds and loans. Indeed, on a monthly basis, a Sunwest employee would transfer funds from the clearing account into Harder's personal account to pay for his family bills, and funds often were transferred to him or his family on an ad hoc basis. Several Principals had access to the clearing account, as did Harder's wife. Inter-entity loans were also funneled through various bank accounts in addition to the clearing account. Those accounts also regularly included a commingled amount of business and personal funds of various Sunwest Entities. One of those accounts was an overdraft account with Wells Fargo, which was intended to be used solely to pay the numerous overdraft fees that Wells Fargo charged due to the high number of overdrafts that the Sunwest Entities experienced on their Wells Fargo accounts, but which instead was also used to make loans and other payments to various Sunwest Entities, including Receivership Facilities. This commingling of funds also was not disclosed to investors, and violated the terms of the operating agreements of the Receivership Facilities and the loan documents between the Receivership Facilities and the Lenders.

13. Generally, an individual invested in a given facility by becoming a member of a single-purpose limited liability company, organized in Oregon ("TIC LLC"), which held a fractional tenant-in-common interest ("TIC") in the real property of the facility. For each facility, there were multiple investors holding TICs through their respective TIC LLCs. Each TIC LLC leased its interest to the facility's Operating Company in return for regular "rent"

payments. The Operating Company retained the right to buy out the TIC LLCs through a purchase option agreement that each TIC LLC executed. Many investors sought to engage in like-kind exchanges under section 1031 of the Internal Revenue Code, and the TIC LLC structure was designed to make investment in the facilities attractive to those investors. In many cases, the Sunwest Entities also offered "preferred membership" interests in the Operating Company as an additional means of raising equity. The offering process for such memberships was very similar to the offering process for TIC interests. The offering memoranda and investment opportunities were securities but were not registered as securities with any state or federal authority.

  14.  Because the financial performance of the various Receivership Facilities was inadequate to sustain them, the perpetuation and growth of the Sunwest Enterprise depended on attracting new capital from Lenders and investors to pay off outstanding debts to existing Lenders, investors and creditors—simply put, the Sunwest Enterprise operated as a Ponzi-like scheme. To keep the Sunwest Enterprise afloat, over $400 million was collected from some 2,175 investors and more than $1.7 billion was collected from numerous Lenders, more than $260 million of which was assumed by TIC LLCs as a way to leverage their investment. Although, according to a 2006 due diligence report by Crown Capital Securities, Inc., the Receivership Entities had a negative net worth of $25 million, and although the Receivership Entities failed to obtain the enterprise-wide or near-enterprise-wide refinancing that they sought in 2007, the scheme was so successful that investors received almost every payment due to them until June 2008, when the economic crisis and credit crunch finally caught up with the Sunwest Enterprise. From that point forward, there have been no payments to investors. Numerous investor lawsuits have resulted, as well as numerous lawsuits and foreclosure actions brought by Lenders and a bankruptcy filing by Harder.

**The Offering Memoranda**

15.     To attract investors, CCD, CCF, and the Property and Operating Companies of the facilities for which investment was sought had offering memoranda prepared by outside counsel describing the facilities, their finances, and the investment opportunities and risks. The three firms which prepared offering memoranda were K&L Gates, Davis Wright Tremaine LLP ("DWT"), and Thompson & Knight LLP ("Thompson & Knight"). In addition, both K&L Gates and Thompson & Knight issued tax opinions based on their analysis of offering memoranda which were intended to make the investments more attractive to persons seeking a 1031 exchange. Lawyers from the three firms reviewed offering memoranda prepared by the others and attempted to make them consistent. The offering memoranda contained numerous misstatements and omissions of material fact which rendered them misleading. Among other things, the offering memoranda falsely told investors that they would own a share of a single facility or project that would stand or fall on its own and that all of the money would remain in that facility or project. The offering memoranda failed to properly disclose, among other things, the following:

         a.     that investor funds would be loaned to Sunwest Entities other than the property and operating companies of the facilities in which the investors' TIC LLCs had an interest;

         b.     that funds from other investors had in the past been loaned to Sunwest Entities other than the property and operating companies of the facilities in which those investors' TIC LLCs had an interest;

         c.     that investor funds would be commingled with funds of Sunwest Entities other than the property and operating companies of the facilities in which the investors' TIC LLCs had an interest;

Page 9 –      COMPLAINT

      d.     that funds from other investors had in the past been commingled with funds of Sunwest Entities other than the property and operating companies of the facilities in which those investors' TIC LLCs had an interest;

      e.     that the commingling and inter-entity lending violated the operating agreements of the Receivership Facilities;

      f.     that the commingling and inter-entity lending violated the terms of the loans from Lenders to the Receivership Facilities;

      g.     that numerous Receivership Entities were in default or near-default of various obligations they owed totaling hundreds of millions of dollars, which would render continued payment of rent to investors nearly impossible;

      h.     that the true net worth of the Receivership Entities was significantly negative;

      i.     that a majority of Receivership Facilities failed to meet projections in their first two years;

      j.     that the Receivership Entities failed to obtain enterprise-wide or near-enterprise-wide refinancing that they sought in 2007; and

      k.     that the success of any particular Receivership Facility depended not on the independent ability of that Facility to achieve positive net operating income, but rather on the ability of the Sunwest Entities to obtain new financing from Lenders and investors.

      16.     As a result of these misstatements and omissions, investors who provided funds to the Sunwest Enterprise are claiming to be entitled to a number of remedies, including rescission of the investments as provided by applicable law.

### The Role of K&L Gates

17.     K&L Gates provided representation, counsel, and assistance to a substantial number of Receivership Entities starting in or before March 2006.  In that regard, K&L Gates prepared, or participated materially in the preparation of, over 30 offering memoranda for investors.  K&L Gates also prepared tax opinion letters for many of those offering memoranda. K&L Gates similarly prepared, or participated materially in the preparation of, operating agreements, management documents and loan documents for the Receivership Entities and TIC LLCs, as well as other agreements that formed the basis of the business in which the Sunwest Entities and TIC LLCs engaged.  K&L Gates also prepared, or participated materially in the preparation of agreements for CCD as "Sponsor".  K&L Gates' work included offerings to both TIC investors and preferred membership investors.  K&L Gates work included offerings for the purchase of existing senior housing facilities and the purchase and development of proposed senior housing facility sites, as well as commercial and apartment TIC investments with the Sunwest Entities.

18.     During its work for the Receivership Entities, K&L Gates knew or should have known about the following problems:

        a.      that the various Receivership Entities had conflicting interests because, for instance, the Sunwest Entities required additional cash to survive, and used individual facilities to support the entire Sunwest Enterprise;

        b.      that the Principals were breaching their fiduciary duties to the Receivership Entities by causing breaches of  loan agreements and operating agreements, selling securities through the use of material misrepresentations and omissions, and other actions and omissions;

Page 11 –      COMPLAINT

c.     that the Sunwest Entities engaged in the inter-entity lending described above;

d.     that there was little or no documentation of most inter-entity loans;

e.     that the Sunwest Entities commingled funds belonging to the various Sunwest Entities and TIC LLCs in the clearing account and other accounts;

f.     that the commingling violated the operating agreements of the Receivership Facilities;

g.     that the inter-entity lending violated the operating agreements of the Receivership Facilities;

h.     that the commingling violated the terms of the loans from Lenders to the Receivership Facilities;

i.     that the inter-entity lending violated terms of loans from Lenders to the Receivership Facilities;

j.     that the offering memoranda contained material misrepresentations and omissions as described in paragraph 15;

k.     that a large number of the Receivership Entities had a negative net worth;

l.     that a large number of Receivership Entities had serious cash flow issues;

m.     that a majority of Receivership Facilities failed to meet projections in their first two years;

n.     that the Receivership Entities failed to obtain enterprise-wide or near-enterprise-wide refinancing that they sought in 2007;

o.     that numerous Receivership Entities were in default or near-default of various obligations totaling hundreds of millions of dollars, which would render continued success of the Entities and repayment of the Lenders and investors nearly impossible;

p.    that the Sunwest Enterprise amounted to a Ponzi-like scheme; and

q.    that the Sunwest Enterprise would result in the failure of the Receivership Entities and numerous lawsuits against the Receivership Entities.

19.    At the end of its run, K&L Gates began inserting certain additional "risk" disclosures into the last few private placement memoranda it worked on, or issued "supplements" with some additional risk disclosures.  Those "risks" included negative cash flow, stalled or delayed development projects, cost overruns, failure to meet projections, and inter-entity lending. While still not sufficient, those belated disclosures serve to highlight and confirm the material omissions and deficiencies in the numerous offerings by which the Sunwest Entitites and K&L Gates had already raised tens of millions of investor dollars.  Despite those belated disclosures, K&L Gates did nothing to correct the prior misleading private placement memoranda that it had prepared.

20.    During its work for the Receivership Entities, K&L Gates owed each and all of those entities fiduciary duties, including the duty of loyalty, the duty not to make misrepresentations to a client, the duty to defend and protect a client's interests, and the duty to exercise such skill, prudence, and diligence as attorneys of ordinary skill and capacity commonly possess and exercise in the performance of the tasks they undertake.

## FIRST CLAIM FOR RELIEF

### (Professional Negligence)

21.    The Receiver realleges paragraphs 1 through 20.

22.    K&L Gates committed professional malpractice in its representation of the Receivership Entities  in that it negligently:

a.    failed to disclose or obtain waivers of potential and actual conflicts of interest;

      b.      represented the Receivership Entities simultaneously when their interests were in actual conflict;

      c.      failed to obtain adequate skill and knowledge to competently represent them;

      d.      failed to advise them about the problems described in paragraph 18;

      e.      failed to advise them to cure the problems described in paragraph 18;

      f.      failed to cure the problems described in paragraph 18; and

      g.      participated in and materially aided the problems described in paragraph 18.

23.      As a direct and natural result of K&L Gates' malpractice, the Receivership Entities have suffered substantial damages well in excess of $100 million dollars, including their failure as ongoing enterprises, their inability to pay the debts and claims of the various Lenders and investors, and the amounts that they paid K&L Gates for its services.

24.      The Receivership Entities are entitled to a judgment in their favor and against K&L Gates in the full amount of their damages plus prejudgment interest.

## SECOND CLAIM FOR RELIEF

### (Negligent Misrepresentation)

25.      The Receiver realleges paragraphs 1 through 20.

26.      K&L Gates' actions and omissions during the course of representing the Receivership Entities constituted a representation that none of the problems described in paragraph 18 existed and that, even if they did, they were not material.  That representation was made for the guidance of the Receivership Entities in the operation of their businesses, and it was false, as K&L Gates knew or should have known in the exercise of reasonable care.  K&L Gates

failed to exercise reasonable care in obtaining and providing the information to the Receivership Entities that was false.

27.    The Receivership Entities relied on the advice and counsel of K&L Gates at a time when K&L Gates knew or should have known of the problems described in paragraph 18. The Receivership Entities' reliance on K&L Gates' misrepresentations was reasonable considering the attorney/client relationship and the reasonable expectation that K&L Gates would be looking out for the best interests of the Receivership Entities.

28.    As a direct and natural result of K&L Gates' negligent misrepresentation, all of the Receivership Entities have suffered substantial damages well in excess of $100 million dollars, including their failure as ongoing enterprises, their inability to pay the debts and claims of the various Lenders and investors, and the amounts that they paid K&L Gates for its services.

29.    The Receivership Entities are entitled to a judgment in their favor and against K&L Gates in the full amount of their damages plus prejudgment interest.

### THIRD CLAIM FOR RELIEF

### (Aiding and Abetting Breach of Fiduciary Duty - Principals)

30.    The Receiver realleges paragraphs 1 through 20.

31.    The Principals each owed a fiduciary duty to act in the best interests of the Receivership Entities, separately considered.  In addition, the Principals owed a fiduciary duty of full disclosure to each of the Receivership Entities.  The Principals breached their respective fiduciary duties when they caused the problems described in paragraph 18 and failed to disclose or cure those problems.

32.    K&L Gates had actual knowledge of one or more breaches of fiduciary duties by the Principals, and K&L Gates provided substantial assistance to the Principals with respect to

those breaches by participating in, helping to create, and failing to disclose or cure the problems described in paragraph 18.

33.     In the alternative, K&L Gates owed a separate duty to each of the Receivership Entities, which separate duty was breached in the manner set forth in paragraphs 17-29 and, in its breach of that duty owed to each Receivership Entity, K&L Gates provided substantial assistance to the Principals in their breaches of fiduciary duties to the Receivership Entities.

34.     As a direct and natural result of (a) the Principals' breaches of their respective fiduciary duties and (b) K&L Gates' aiding and abetting those breaches, the Receivership Entities have suffered substantial damages in excess of $100 million dollars, including their failure as ongoing enterprises, their inability to pay the debts and claims of the various Lenders and investors, and the amounts that they paid K&L Gates for its services.

35.     The Receivership Entities are entitled to a judgment in their favor and against K&L Gates in the full amount of their damages plus prejudgment interest.

## FOURTH CLAIM FOR RELIEF

### (Disgorgement)

36.     The Receiver realleges paragraphs 1 through 20.

37.     K&L Gates' simultaneous representation of the various Receivership Entities despite the conflicts of interest between those entities violated K&L Gates fiduciary duties to the Receivership Entities and violated the Oregon Code of Professional Responsibility. Accordingly, K&L Gates must disgorge all fees it received from the Receivership Entities in the course of representing them.  K&L Gates owes those fees to the Receivership Entities from which they came, plus prejudgment interest thereon from the dates when K&L Gates received those fees.

WHEREFORE, the Receiver prays for judgment against K&L Gates as follows:

1.     On his first three claims for relief:

    a.     For damages in an amount according to proof, but not less than $100 million;

    b.     For prejudgment interest;

    c.     For costs of suit herein incurred; and

    d.     For such other and further relief as the court deems proper.

2.     On his Fourth claim for relief:

    a.     For damages in an amount according to proof, but not less than $1 million;

    b.     For prejudgment interest:

    c.     For costs of suit herein incurred; and

    d.     For such other and further relief as the court deems proper.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

3.    Plaintiff requests trial by jury.

DATED this 13th day of July, 2009.

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP

Stephen S. Walters, OSB #801200
David Osias, CA Bar No. 091227
David Zaro, CA Bar No. 124334
Attorneys for Receiver Michael Grassmueck
Ph:  415-837-1515
Fx:  415-837-1516
Email:    swalters@allenmatkins.com
          dosias@allenmatkins.com
          dzaro@allenmatkins.com


LARKINS VACURA LLP

William L. Larkins, Jr., OSB #812882
Julie R. Vacura, OSB #843692
Attorneys for Receiver Michael Grassmueck
Ph: 503-222-4424
Fx: 503-827-7600
Email: wlarkins@larkinsvacura.com
       jvacura@larkinsvacura.com